LIVINGSTON and others *against* NEWKIRK and his Wife.

*January* 26, *and February* 18.

After acquired lands do not pass by a will previously made.

An *equitable* interest in land, founded on articles of agreement for the purchase, will pass by a subsequent devise ; and if there be no devise, it will descend to the heir ; and the executor must pay the purchase money, for the benefit of *the heir*.

Where a deed to the testator comes into possession of the executor, who does not produce it, or account for its loss, the most favourable intendment, as to its contents, will be made for the benefit of the heir.

If an executor or administrator pays debts out of his own monies, to the value of the personal assets in hand, he may apply those assets to reimburse himself: and, by such election, the assets become his own property.

If an executor be directed to sell land, *it seems*, that he cannot retain it, as he may *personal* assets.

But if the *personal* assets prove insufficient, and the executor has paid debts, out of his money, to the value of the land, he may, if the land is ordered to be sold, retain the proceeds for his own indemnity.

The order of *marshalling assets*, towards the payment of debts, is, to apply, 1. The general *personal* estate : 2. Estates *specifically* and *expressly* devised for the payment of debts, and for that purpose only : 3. Estates *descended*: 4. Estates specifically devised, though generally charged with the payment of debts.

THE bill, the 26th of *November*, 1812, stated, that letters patent were granted the 8th of *July*, 1790, to *John Earnest Pier*, for lot No. 6, in the township of *Marcellus*. In 1791, *Pier* sold the lot to *Peter Schuyler*, for *thirty* pounds, and by writing under his hand and seal, sold and conveyed, or covenanted to sell or convey, the said lot, for the consideration aforesaid, to *P. S.* in fee, and delivered the deed to him. *P. S.*, on the 24th of *November*, 1786, made his will, and devised the residue of his real and personal estate, after payment of his debts, to his wife, *Gertrude*, in fee. *P. S.* died without issue, on the 4th of *January*, 1792, without altering or republishing his will. His wife, as sole executrix, proved the will, and took possession of all the estate, and his books and papers, among which was the deed, or covenant, as the plaintiffs alleged, for the said lot. The plaintiff, *C. L.*, is the only

1818.

LIVINGSTON
v.
NEWKIRK.

sister of *P. S.*, the testator, and *J. C.* and *W. C.*, his only brothers and heirs at law. The plaintiffs alleged, that *G. S.* the widow, and executrix, for the fraudulent purpose of defeating the plaintiffs, as devisees, obtained a release from *Pier* to her, for the said lot, and afterwards destroyed or suppressed the said deed or covenant to the testator; that she, in 1794, married the defendant, *N.*, who fraudulently advised or approved the measure. The bill prayed for general relief, &c.

The defendants, in their answer, admitted the letters patent, and that an instrument in writing, of some kind, was executed between *Pier* and *P. Schuyler*, relative to the lot, but they did not recollect, and had no means of ascertaining the precise date, or the nature and terms of the instrument; and they believed that the instrument was lost or destroyed, but they were ignorant when or how it was destroyed, or what had become of it. The defendant *G.* (Mrs. *N.*) said that soon after the death of *P. S.* she found the said instrument among his papers, and showed it to *C. J. Y.*, and requested his opinion on it, and he informed her, that it was of no effect; that she, thereupon at the solicitation of *Pier*, on the 31st of *August*, 1792, agreed with him for the purchase of the lot, and took from him a conveyance in fee, for the consideration of thirty pounds, which she paid to him. That when she married *P. S.* she was seised of a large real estate, which he sold, during the coverture, and applied the proceeds to his own use; and that the land so sold exceeded in value the estate of which *P. S.* died seised, after payment of his debts. That *P. S.*, who died the 4th of *January*, 1792, having duly made his will, dated *November* 4, 1786, on his death bed directed the defendant *N.* to transcribe his will, in order to a republication of it, and the defendant brought the will to *P. S.*, and told him that it was as fair as he could write it; that at the request of *P. S.* he read it in the presence of three credible witnesses, and *P. S.* declared it to be all right; that he

meant that his wife should have all his estate; and directed *N.* to put the will under cover and preserve it. On her examination, taken under the act to perpetuate testimony, on the 19th of *March*, 1812, she said, that she did not know whether the writing from *Pier* was a covenant or a deed, but after her husband's death she took it to *C. J. Y.* who told her that she had not better pay *P.*, unless he would execute a deed. That she offered *P.* the writing, when he executed the deed to her, and he left it with her. That she paid *P.* thirty pounds, in flour, wheat, and money, and that he executed the deed to her, in pursuance of the original agreement, which was in 1791.

The defendants, in their answer, stated, that they had paid debts of the testator *P. S.* to the amount of 8,951 dollars, 4 cents, of which a schedule was annexed, and had borrowed money, on their credit, for that purpose, for want of assets; and they believed that there were other debts remaining unpaid, and unascertained. That the whole real and personal estate of *P. S.* was not equal to the debts so paid. That on the 29th of *September*, 1808, they sold the said lot in parcels, to six different persons, for 2,900 dollars, and had given deeds, and taken bonds and mortgages for the purchase money, about half of which had been paid; and that this was done with the knowledge of *James Cochran*, one of the plaintiffs, before whom, being then a Master in Chancery, the mortgages were acknowledged.

Several witnesses were examined on the part of the defendants. *Pier* testified that he sold the lot to *P. S.* for 30 pounds, a small part of which was paid in cash, and the residue in grain, from time to time, and that he executed a writing under seal to *P. S.* which he understood to be a deed for the lot. That after the death of *P. S.*, being told that the writing he had given was not good, he called on the defendant *G. N.* and offered to execute a good deed; and another deed was drawn, which she executed.

That neither of the defendants paid him any thing for this deed, nor has he received any consideration for the lot, other than what was paid to him by *P. S.* ; that he has never seen the deed by him to *P. S.* since it was executed; that he executed the second deed because he was told the first was not good.

*A. G.* a witness testified, that the real estate of *P. S.* at his decease, was worth about 4,000 dollars, and his personal estate 823 dollars; that the real estate consisted of a farm of 200 acres, in *Palatine*, in the county of *Montgomery*. By the will of *P. S.* his debts were charged on his real estate, and his widow, who was sole devisee and executrix, was authorized to sell it.

*J. V. Henry*, for the plaintiffs.

*Van Vechten*, contra.

THE CHANCELLOR. 1. The first question upon this case is, whether the plaintiffs were not, upon the death of *Peter Schuyler*, entitled, as his heirs at law, to lot No. 6, in *Marcellus*.

The will of the testator was made on the 24th of *November*, 1786, and it was not afterwards altered or republished with the solemnities required by law. The will, therefore, did not, and could not, affect lands subsequently acquired.

It appears from the pleadings and proofs, that the testator, after making his will, purchased, or contracted to purchase, the lot in question, and that he received from *John Earnest Pier*, the original patentee of the lot, either a conveyance in fee, or a covenant on the part of *Pier* to convey the lot, for a valuable consideration. According to the testimony of *Pier*, a formal deed in fee was executed and delivered by him to *Schuyler*, and the consideration of 30*l.* paid. The defendants admit, that an instrument in writing of some kind was executed and delivered, but they cannot

*1818.*

LIVINGSTON
v.
NEWKIRK.

Lands acquired by a testator after making his will, do not pass by it. *S. P. ante.* p. 310. *M'Kinnon* v. *Thompson.*

1818.

LIVINGSTON.
v.
NEWKIRK.

recollect the nature or terms of it. The defendant, Mrs- *Newkirk*, who was the widow of the testator, and his sole executrix, admits, that she found such an instrument among the papers of the testator, after his death, and that she took it to counsel to obtain an opinion thereon. She farther admits, that the instrument is lost or destroyed, though she cannot tell when or how, and that she took a deed in fee to herself from the patentee, and paid him the original price. The patentee says, that he re-executed such a deed to her, because he was told the first writing was not sufficient; but he denies that he ever received any farther consideration, or any payment from her. In an examination of Mrs. *Newkirk*, taken *de bene esse*, under the *act of the* 19*th of March*, 1812, *to perpetuate testimony*, she admits, that when *Pier* executed the deed to her, she offered him the original writing, but that he left it with her.

An equitable interest in land, founded on articles of agreement for the purchase, will pass by a subsequent devise; and if there be no devise, it will descend to the heir; and the executor must pay the purchase money for the benefit of the heir.

Whether the writing in question was a conveyance of the lot, or only an agreement to convey, does not appear to me to be material. An equitable interest founded upon articles for a purchase, and which a court of equity will specifically enforce, is real estate which will pass by a devise made subsequently; and if there be no such devise, will descend to the heir, and the executor must pay the purchase money for the benefit of the heir. (*Greenhill* v. *Greenhill, Prec. in Ch.* 320. *Langford* v. *Pitt,* 2 *P. Wms.*

Where an instrument under seal, being either a deed for land to the testator, or a covenant to convey land is found by his *executrix* and *devisee,* among his papers, and which she does not produce, nor account for its loss, the court will make the most favourable intendment, as to its contents, for the benefit of the *heir.*

629.) But in this case I have a right to conclude that an absolute conveyance in fee was executed by *Pier* to the testator. Here was a writing which came to the possession of the defendants, and upon which the executrix took advice, and which writing stood in the way of her interest under the will, and which she does not now produce. She does not account for its loss. I will, therefore, give the most favourable intendment as to its contents, for the benefit of the heir. This is the settled doctrine in the books; and it is founded on the maxim of law, that *omnia presumuntur in odium spoliatoris,* (*Hudson* v. *Arundel, Hob.* 109. 2 *P.*

*Wms.* 748. *S. C. Dalston* v. *Coatsworth,* 1 *P. Wms.* 731. 
Lord *Hardwicke,* in 1 *Vesey,* 235.) The existence of the in-
strument, and which Sir *Joseph Jekyll* said, in (2 *P. Wms.*
748. 750.) was fundamental to a decree on the point, is ad-
mitted. We have also the direct and positive testimony of
the grantor, that the instrument was not merely an agree-
ment to convey, but an actual conveyance of the lot. My
conclusion, accordingly, is, that lot No. 6, in *Marcellus,* de-
scended, on the death of *Peter Schuyler,* to the plaintiffs,
as his heirs at law, and that they became seized in fee.

2. The next point in the case is, upon what principles,
and to what extent, the defendants are to account to the
plaintiffs for the value of the lot.

By the will of the testator, he directed that his debts
should be paid out of his personal estate, and if that should
prove deficient, that the deficiency should be supplied out
of his real estate ; and the executrix was authorized to sell
so much of it as should be requisite for that purpose. He
then gave all the residue of his estate, real and personal,
to his wife, in fee, and made her sole executrix.

The defendants state, in their answer, that the debts
against the estate, and paid by them, amounted to 8,951
dollars and 4 cents, of which they have annexed a list; and
that they have expended large sums of their own money
for that purpose. They state further, that the whole real
and personal estate of the testator was not equal to the debts
which they have paid ; and they have furnished proof that the
personal estate of the testatator did not exceed 823 dollars,
and that the real estate, exclusive of the lot in question,
did not exceed 4,000 dollars, in value. They state further,
in their answer, that upon establishing the title of the ex-
ecutrix under the patentee, by a trial at law, they sold
the lot in parcels for 2,900 dollars ; and they have given
proof of such sales, and of the amount of the considera-
tion given for one of the parcels.

1818.

LIVINGSTON
v.
NEWKIRK.

If , an executor or administrator pays out of his own moneys, debts to the value of the personal assets in hand, he may apply the assets to his own use towards satisfaction of his moneys so expended. And, by such election, the assets become his own property.

If an executor be directed to sell land, it seems' that he cannot retain it as he may personal assets. But if the personal assets should prove insuficient, and the executor has paid out of his own moneys debts to the value of the land, he may if the land is ordered to be sold, retain the proceeds for his indemnity.

If a reference is to be had to ascertain these facts, with more precision, it is previously necessary to determine to what extent the executrix is to be held responsible.

The rule is well established, that if an executor or administrator pays, out of his own moneys, debts to the value of the assets in hand, he may apply the assets to his own use, towards satisfaction of the moneys he has expended. (*Plowd.* 186. a. *Dyer.* 2. a. 187. b. *S. Touch.* 454. 464. 1 *Saund.* 307. *Off. of Ex'rs*, p. 89, 90.) The assets, by such election, become absolutely his own property. This rule has always been applied to the personal assets; and it is said (*Dyer.* 2. a.) that if the executor be directed to sell the lands, he cannot retain it in hand, as he may personal assets, because the direction of the will is that it be sold. This case seems to put the distinction altogether upon the testator's *intention ;* and if the personal assets prove deficient, and the executor pays out of his own moneys, to the value of the land, there does not appear to be any solid ground for the distinction. If this court was to direct the lands to be sold in such a case, it would certainly allow the executor to retain for his indemnity. The object of the will, and the ends of justice, are equally attained, if the value of the real as well as of personal assets, be faithfully applied in discharge of the debts. But in this case, the lot in *Marcellus* was sold, as soon as it was cleared of adverse claims ; and the plaintiffs have no further interest in the question than to see to the due application of the proceeds of that sale.

If the executrix was bound to apply, in the first place, the lands devised to the discharge of the debts, or if the lands devised, and the lands desended were to bear, equally and rateably, the charge of the debts, then the inquiry before a Master will be necessary, to ascertain, with certainty, the amount of the debts, the payments which have been made, and the value of the lands devised. If the allegations in the answer should turn out to be

supported by proof, as to points where further proof is necessary, then there will be nothing coming to the plaintiffs, and the object of their bill will fail. It cannot, for a moment, be maintained, that the plaintiffs are entitled to hold the land descended, or the proceeds of that land, free of the charge of paying the debts.

I am of opinion, that the land descended to the plaintiffs is to be applied to the discharge of the debts, on failure of the personal estate, *before* the lands devised to the widow; and that the latter are to be applied, *only so far* as may be requisite to make up the deficiency. The order of marshalling assets towards payment of debts, is to apply, 1. The personal estate : 2. Lands descended : 3. Lands devised. This is the general course, and every departure from it may be considered as an exception to a general rule.

The order of marshalling assets towards payment of debts, 1. The personal estate; 2. Lands descended; 3. Lands devised.

This order of marshalling assets was declared by Lord *Talbot*, in *Pitt* v. *Raymond*, (cited in 2 *Atk.* 434.) and again in *Chaplin* v. *Chaplin*, (3 *P. Wms.* 364.) In the latter case, he held, that where the testator was indebted by bond, and devised part of his real estate to his three daughters, and suffered another part to descend undevised to his son and heir at law, that the lands descended must be liable for the bond debt, before the land devised, for by applying the land devised to pay the debt, the will would be disappointed. It is too well settled to be questioned, that the personal estate is to be first applied to the payment of debts and legacies, and that a mere charge on the land will not exonerate the personal estate, nor any thing short of express words, or a plain intent in the will of the testator. (*Ancaster* v. *Mayer*, 1 *Bro.* 454. *Watson* v. *Brickwood*, 9 *Vesey*, 447.)

The doctrine I have stated is not only thus well supported by authority, but it has been applied to cases precisely like the present.

In *Galton* v. *Hancock*, (2 *Atk.* 424. 427. 430. *Ridge-*

*way's Rep.* 301. S. C.) the testator, seized in fee of an estate, borrowed money upon mortgage, and then made his will, and "after all his just debts were satisfied," he devised the estate mortgaged, and also an estate for lives, to his wife, and made her sole executrix. He, after making his will, purchased the reversion in fee of the life estate, and died. The bill was filed by the heir at law, against the widow, insisting that the estate descended was not liable to pay the mortgage debt. But Lord *Hardwicke* decreed otherwise. He decided, after much consideration, and on a rehearing, that the widow was entitled to have the mortgage upon the estate devised to her, exonerated out of the real estate descended to the heir. Every devisee was said to be in the nature of a purchaser, and the heir was not entitled to contribution against a purchaser. He thought "the case not hard upon the heir, because the testator clearly intended to give away the whole estate from the heir, and because it was an accident merely, which threw a part of it upon him, viz. the ignorance of the testator that it was necessary, after purchasing in fee of the estate, *pour auter vie*, to publish the will, to make it to pass to the widow.

This case is, in many respects, strikingly analogous to the one now under discussion. The difference is, that in *Galton* v. *Hancock*, the real estate was not expressly made chargeable with the debts on failure of the personal : nor was the executrix authorized to sell it. But the devise there was *after all his just debts were satisfied*, and part of the estate devised was *charged with a mortgage debt ;* yet the burden of discharging that very debt was thrown upon the land descended, in exoneration of the land devised.

The case of *Wride* v. *Clark*, decided by Sir *Thomas Sewell* in 1765, (*Dickens*, 382. 2 *Bro.* 261. note,) approaches still nearer, in all its circumstances, to the one before me. The testator, in that case, *charged all his real and personal estate with the payment of his debts, and*

*subject thereto*, he devised his real estate to his wife, in fee, and appointed her sole executrix. He afterwards purchased other lands which descended undevised to the heir at law. The debts exceeded the personal estate, and the Master of the Rolls decided that the descended estate should be applied previous to the devised estate. So, in *Davies* v. *Topp*, (2 *Bro.* 259. note,) the same rule received the sanction not only of the same Master of the Rolls, but of Lord *Thurlow*. In that case, the testator, seized of real estates in fee, *subject to a mortgage*, by his will made all his real and personal estate *chargeable with the payment of his debts and legacies, and, subject thereto*, devised his real estates to *L.*, and made him executor. After making the will, the testator purchased other real estate, and died, leaving two sisters, to whom the real estate purchased after the will, descended. The Master of the Rolls directed that the personal estate not specifically bequeathed, be first applied in payment of the debts and legacies, and that the deficiency due to the mortgagee and other specialty creditors, should be raised out of the real estate descended; and if that was insufficient, then the deficiency to be made good out of the real estates devised and charged with the payment of debts. This decree, on appeal, was affirmed by the Lord Chancellor.

It would be in vain to search for cases more completely applicable; and it is impossible to distinguish the present case, in any material degree, from those which have been cited, and which must be regarded as the established law of the Court.

In *Donne* v. *Lewis*, (2 *Bro.* 257.) which was subsequent to the above cases, an exception was made by Lord *Thurlow* to the operation of the general rule, under special circumstances, forming that exception, and which circumstances have no existence in the present case.

The testator devised lands in trust, to sell and pay debts, and in case the trust estate should not be sufficient,

that the deficiency should be charged on the five several estates specifically, and very particularly, devised to his five children, each estate to bear one fifth part of such deficiency. The testator purchased another estate after making his will, and died.

The question was, whether the testator was to be considered as giving an absolute direction out of what fund the payment should come, or merely as arranging the property he had at the time of making the will, without any view of exempting or favouring any property he acquired

:Lord Thur-
low's opinion as
to the order, or
marshalling of
assets, for the
payment of
debts.

afterwards. Lord *Thurlow* went at large into the consideration of the subject, and reviewed the preceding cases. He said his idea of the order of affecting assets, was, 1. The general personal estate. 2. Ordinarily speaking, estates devised *for the payment of debts*. 3. Estates descended. 4. Estates specifically devised, even though they are generally charged with the payment of debts.

The Chancellor brought the case then before him under the second head; and it is evident that he meant to be understood, by estates under that head, estates *specially devised*, for the express and *particular purpose* of paying debts, and not merely estates generally charged with the payment of debts; for those estates fell under his fourth division. He declared, in the case, that the rule was settled, that a bare charge of the debts upon the land would not do; and he said the only question that could reconcile all the cases was, were the terms of the will only a general indication, that the testator meant to subject his property to his debts, or did he mean more, and to make a particular provision for the purpose? In the case before him, the will went further than in *Davies* v. *Topp*. The testator meant to charge an estate *specifically*, and that intention could not be executed, without exempting the estate descended; and, therefore, his Lordship, after admitting the authority of *Wride* v. *Clark*, and *Davies* v. *Topp*, decreed, that the debts must be paid out of the trust estate, and then out of the devised estates ex-

pressly and particularly pointed out in aid of the trust fund.

The question in this case was truly between the descended estate and the *the trust fund*, specially bequeathed for payments of debts; for the testator had declared, that the *deficiency of that fund should be supplied by the contribution of the five children*; and, therefore, as to the point of the case, they were to be taken as *one fund*.

This decision was no more than what Lord *Hardwicke* had declared in *Powis* v. *Corbet*, (3 *Atk.* 556.) that where a testator created a particular trust out of particular lands, and subject to that trust, devised them over, the devisee could take no benefit but of the remainder; and in such a case the heir at law stood in a better situation than the devisee.

Since the time of Lord *Thurlow*, the question was brought before Lord *Alvanley*, as Master of the Rolls, in *Manning* v. *Spooner*, (3 *Vesey*, jun. 114.) and all the authorities on the point of marshalling assets, as between the heir and devisee, were reviewed and discussed.

In that case, the testator devised his real estate to *trustees*, to be applied "in payment of such of his debts and legacies as the residue of his personal estate should prove deficient in paying." After making the will, he purchased other lands, and died. The question raised was, whether the descended estate became liable for the debts before the application of the fund to arise from the devised estate under the trust in the will? The Master of the Rolls, in delivering his opinion, observed, that the question depended entirely upon the point, whether there was *a specific gift of any part of the estate for the purpose of paying the debts*, or whether it was only a *general charge* for the purpose. That the case of *Donne* v. *Lewis*, was determined upon principles that had been constantly acted upon since, and which must govern all such cases. That the order of application to debts was, 1. The general per-

·LIVINGSTON
v.
NEWKIRK.

sonal estate, unless exempted expressly, or by plain impli-
cation: 2. Any estate *particularly* devised for *the pur-
pose*, and only for the purpose, of paying debts. 3. Es-
tates descended. 4. Estates specifically devised. That
the question, in every case, where the contest is between
an estate descended and an estate alleged to be provided
for the debts, is, whether it be a general charge, or any
part of the estate *be selected*, for the *express purpose* of pay-
ing the debts. That if part be selected for that purpose,
that part is to be applied before the descended estate,
whether the testator had the descended estate before he
made his will or not. That Lord *Thurlow*, in considering
the prior cases, was clearly of opinion, that the question
was, whether the testator had *selected* any part of his es-
tate, which it was his will should be first applied, or whe-
ther the charge was only *to subject his estates to the pay-
ment of his debts*. Taking this rule for his guide, Lord
*Alvanley* held, in that case, that the real estate devised
was specially appropriated as a fund to pay the debts, *and
for no other purpose*, and that the heir was not to be called
upon in that case, until the appropriated fund had become
exhausted.

This construction of the rule is in perfect conformity
with the doctrine in all the preceding cases; and the rule
is stated with such accurate deduction, and with such clear
precision, as to remove all doubt on the subject. There
is no contradiction among the cases. Lord *Thurlow*
seemed to admit that they were all consistent with each
other, and rested on one simple principle.

The law on this point was, afterwards, brought into re-
*Lord Eldon on* peated discussion before Lord *Eldon*, and though he ap-
*the same point.* peared to subject the cases to criticism, and to suggest
doubts and difficulties, and though some of his remarks are
wanting in the requisite precision, he undoubtedly left the
rule where it was settled by the former decisions.

In *Harwood* v. *Oglander*, (6 *Vesey*, 199. 8 *Vesey*, 106. *S.*

*C.*) the testator charged all his estates with the payment of his debts; and subject thereto, he devised all his real estates to his wife for life, with remainders over in fee; and he directed, that *as soon after his death as conveniently might be, part of his real estate, with the exception of another part called Canefield, should be sold for the payment of his debts, and that the devisees thereof should join in the sale.* The principal question in the case was, whether the will was not subsequently revoked, as to a part of the real estate called the fee-farm rents, and if so, then another question was, whether these fee-farm rents, descending to the heir at law, would not be primarily applicable to the debts, as descended estates, before estates devised; the Chancellor was of opinion, that the will was partly revoked, and that the fee-farm rents descended to the heir, and were not to be first applied to the discharge of the debts. He understood Lord *Thurlow's* doctrine, in *Donne* v. *Lewis,* to be, that if there was any thing in the will that went beyond a mere charge, and pointed out a particular mode or means, it would save the descended estate. That Lord *Alvanley,* in *Manning* v. *Spooner,* did not express the opinion of Lord *Thurlow,* and that, as he understood Lord *Thurlow,* and the law ever since, the first fund applicable was the personal estate not specifically bequeathed; 2. *Land devised for the payment of debts, not merely charged, but devised or ordered to be sold;* 3. Descended estates; 4. Lands charged with the payment of debts. That the distinction was between charging all the real estate with the debts, and proceeding so much farther as to propose the mode in which the debts were to be paid. In that case, he observed, the will charged the debts, first in general words, then in special words, and directed a sale, and expressly stated the parties who were to join in the sale. It was a devise, therefore, to persons, *coupled with a devise to them for sale for payment of debts.* He admitted the distinction was thin, and seemed to doubt of its sound-

1818.

LIVINGSTON
v.
NEWKIRK.

ness; but being settled, he thought it better to abide by it.

Some of Lord *Eldon's* expressions in this case appear to be too much at large; and they would seem, on the first impression, to control the opinion of Lord *Alvanley*, and to limit the doctrine in the former cases; but when we come to attend closely to the facts upon which his Lordship decided, it will be found, that there is no variation in the rule. The will, here contained a special direction to apply *a designated* portion of the devised lands to the payment of the debts. The appropriation was of a specific part, to the exclusion of another part. It was in exclusion also of the personal estate; for the direction was to sell the part assigned for the debts, "as soon as conveniently might be after the testator's decease," and the parties in interest, as devisees, were directed to join in the sale. No doubt could well exist of the testator's intention, under such a special provision, and marked with this strong circumstance, that other real property which he had at the time was exempted from the application. Here was a creation and designation of a particular fund for the debts, and the devisees of that fund were made trustees for that purpose. *Here was a devise of lands for the purpose of sale to pay debts,* and the case, therefore, fell within the range of the exception to the general order of marshalling assets, and which exception was admitted, as we have seen in *Powis* v. *Corbet*, *Donne* v. *Lewis*, and *Manning* v. *Spooner*.

In *Milnes* v. *Slater*, (8 *Vesey*, 295.) Lord *Eldon* gave a still more mature opinion on the subject.

The testator, in that case, directed that his debts and legacies should be paid out of his personal estate; but if the same should prove deficient, he then directed that the deficiency should be supplied *according to a particular provision for the purpose*, in which, after giving some legacies and a devise of a life estate in part of his lands to his

wife, he devised *all the residue of his real and personal estate to trustees, to raise, by mortgage thereon, a sufficient sum to pay the residue of the debts and legacies,* and then to settle the same estate to certain declared uses. The testator purchased other real estate after making his will, and died.

One question was, whether the estates descended were applicable in ease of the estates devised.

Lord *Eldon* said, that the true question, according to Lord *Thurlow,* was, whether the testator meant only to behave honestly, which is all a *general charge* imports, or whether, beyond that honest conduct in creating a general charge for the security of his creditors, he meant also to *create a particular fund for payment of his debts.* In *Powis* v. *Corbet,* a particular term was raised for the discharge of the debts, which was held sufficient to warrant the application of the lands comprised in it, before the descended estates. His Lordship admitted, that the circumstance of the devisor *having other estates which he does not touch,* goes a great way to show, that by ordering the debts to be paid out of the devised estates, he does not intend the application of those which descended ; but he said *the case was very different where he had no land at the time of the devise, except the land devised, and afterwards, by descent or purchase, acquired other lands.* He considered that, upon the authority of all the preceding cases, the rule must now be considered settled, that whatever may be the ordinary application, if there be a *real fund created for the discharge of debts,* that will be applied first, when the question arises between the heir and devisee, either as to estates which the devisor had at the time, or which he acquired afterwards. He meant by a real fund created, the same as one *selected,* according to Lord *Alvanley's* expression ; and that it was " the creation of a particular fund" that entitled the heir to say the descended estate was exempt. He declared repeatedly that it was *the creation or raising of a particular fund or interest for the debts,* that required

1818.

LIVINGSTON
v.
NEWKIRK.

that fund to be applied, in exoneration of the descended estate, and that such a *particular fund* was created by the will in that case.

If we test the present case by all these examples, it will evidently appear, that there is no creation of any particular fund set apart for the debts, so as to form an exception to the general rule of this court in marshalling assets. The will here went no further than to make a general charge of the debts upon the whole estate, real and personal, and to show that the testator meant to be honest, by charging the real estate with the debts, in default of the personal, and to clothe the executrix with the ordinary powers for that purpose. The direction was general, that if the personal estate should not be sufficient, the deficiency was to be supplied " out of the real estate ;" and the executrix was authorized " to sell the same, or so much thereof as should be necessary to make up the deficiency." The direction was to her as *executrix*, and not a charge upon her as *devisee*. In her latter character, he gave her *the residue* of the estate, after the debts were paid, which was the same thing, in substance, as the devise in *Galton* v. *Hancock*, where the devise of the land was *after all the just debts were satisfied*, or the devise in *Wride* v. *Clark*, and in *Davies* v. *Topp*, which charged all the estate with the payment of the debts, and then, *subject thereto*, devised it. The general authority to sell in this case does not fall within the meaning of any expressions rather indefinitely used by Lord *Eldon ;* for they were to be applied to the cases before him, where a special fund was marked out for the debts, and a duty thrown on the devisee, *qua devisee*, or trustee, to apply that particular fund. To allow this case to break in upon the general rule, which was established as early as the time of Lord *Talbot*, would be to unsettle and destroy that rule altogether. It would be to allow the heir (certainly in this case, contrary to the testator's meaning, for the ineffectual attempts to repub-

lish the will, show clearly that he never meant to die intestate, or to withold any part of his estate from his wife,) to impair or defeat the object of the testator's bounty.

It results, then, from the rule which I have thus deduced from the cases, that the debts of *Peter Schuyler* are to be charged, 1. Upon his personal estate ; 2. Upon the lot No. 6. in *Marcellus*, which descended to the plaintiffs, and was afterwards sold by the executrix; 3. Upon the estate devised to her.

If any credit is to be given to the answer, and to the testimony of two of the witnesses, (*Gray* and *Beardsley*,) the debts not only exhausted the personal estate, but, also, the proceeds of the lot; and a reference to a master for further inquiries on the subject would be useless to the plaintiffs. If it should appear, by the Master's report, that the debts paid are equal to, or exceed, the value of the personal estate, and the amount of the proceeds of the lot, the bill will be dismissed. The plaintiffs may have a reference, however, if they wish, to pursue the inquiry, under the principles which I have laid down; but it will be at the peril of costs.

I shall, accordingly, declare, that the lot in *Marcellus* mentioned in the pleadings, descended, as undevised real estate, to the plaintiffs, as heirs at law; and that the defendants must account for the price for which they sold the lot, in 1808. That upon such accounting, they are to be charged with the value of the personal estate of the testator, which came to the possession of them, or either of them, and to be credited with debts of the testator, which they had paid; and if the debts paid are found to be equal to, or exceed the value of the personal estate, and the proceeds of the said lot, the defendants are to be no further charged but the Master is to report accordingly, to the end that the bill may be dismissed. But if the debts paid do not exhaust the personal estate, or if

having exhausted it, they do not exhaust the proceeds of the sales of the said lot, then the Master is to report the amount of such sales, or of the balance of such sales, as the case may be, remaining unexhausted, together with interest thereon, from the time of such sales, up to the date of the report. And unless the plaintiffs shall, within 40 days from the date of this decree, signify their election, by notice to the solicitor of the defendants, to proceed with the reference, the bill shall then stand dismissed without costs.

Decree accordingly.(a)

(a) Vide *Livingston* v. *Livingston*, ante, p. 148. and *Duke of Cumberland and others* v. *Codrington and others*, ante, p. 229.