W. H. MORROW, Executor, *vs.* S. A. MORROW and others.

October Term, 1875.

CROSS-BILL MAY BE FILED BEFORE ANSWER TO THE ORIGINAL BILL.—It is no ground of demurrer to a cross-bill that it has been filed before the complainant therein has answered the original bill.

PLEADING—CROSS-BILL—ANSWER.—A pleading which is in substance and form a cross-bill is not changed into an answer by a prayer that it be taken also as an answer to the original bill, and such a prayer the court has no power to grant.

PRINCIPAL AND SURETY—LIABILITY OF FORMER TO LATTER ORIGINATES WITH THE RELATION.—The liability of the principal to his surety is an obligation which dates from the creation of the relation, although contingent upon payment by the surety.

PRIORITY OF CLAIMS AGAINST THE ESTATE OF DECEDENTS.—Debts created by a testator in his life-time are entitled to be first satisfied out of the assets of his estate, in preference to debts created after his death in carrying on a business under the provisions of his will, even where the will directs that all

the property the testator may die possessed of shall be responsible for the debts thus incurred.

*Thos. H. Malone, Bradford,* and others, for creditors.
*John Lellyett,* for McClure.

THE CHANCELLOR:—On the 10th of September, 1871, John Morrow died, leaving a will, which was proved and recorded on the 28th of the same month, and on the 2d of October, 1871, the complainant qualified as executor. The provisions of the will are, in substance, these:

Item 1st. "I direct that my funeral expenses and all my debts be paid, as soon after my death as possible, out of any moneys I may die possest of, or may first come into the hands of my executor."

Item 2d. Provides for equality among his children in the final division of his estate.

Item 3d. Directs his home place to be sold, the proceeds to be used in furnishing a home for his wife during life, and his minor children during minority, and a reasonable support for two daughters named, until married, no deduction to be made from the shares of the children for advances under this clause.

Item 4th. "I desire that my sons, William and John, go into partnership, and take charge of my stock in trade and my business, and I desire that the books of my business house be closed from the date of the probate of this will, and the balance found against William H. and John Morrow be brought into the new books against them; and I desire that, should the said William H. and John Morrow remain in the business house, and give their time and attention to it, then William H. Morrow shall receive, as compensation for conducting said business, not less than two thousand dollars per annum, and John Morrow shall receive not less than one thousand dollars per annum, for services; and, if fifty per cent. of the net profits of business shall exceed the three thousand dollars set aside as salaries, William and John Morrow shall be entitled to draw that per cent. in lieu

of salary, William Morrow drawing two-tenths and John Morrow one-tenth of said fifty per cent., and this shall be compensation for services; and said William and John shall have power to employ such clerks and workmen, and pay them such salaries, as they may find necessary, and shall also pay such other debts and expenses as are necessary to carry on the business; and I desire the balance of the profits, after paying the salaries and necessary incidental expenses of carrying on the business, to go into the fund and be used in the way provided in the third clause of this will; and I desire that all the property I die possessed of shall stand responsible for the debts incurred in carrying on the partnership business provided for in this will.''

Item 5th. Provides for advancements by the executor to the children, as they come of age, to be accounted for in the final division of his estate.

Item 6th. '' I prefer that my estate shall not be divided until my youngest child, Hattie, is twenty-one years old, but should it become impracticable or improper to carry on the partnership business under the arrangement above provided for, then I desire that my business shall be closed, and my estate divided in accordance with the provisions of this will. The portions of the minors to be held and used for their benefit by W. H. Morrow as trustee.''

Item 7th. '' I desire that my executor shall have possession of the proceeds of the sale of my home place, and of my stock in trade and property, to be managed and applied as hereinbefore provided, and, when final distribution is made of my estate, I desire all my property to be converted into money, and distributed according to the provisions of this will, but that part of my estate going to my daughters I desire to be conveyed to them, or trustees for them, so as to secure the property to their sole and separate use, free from the debts, liabilities, and control of any husband they may have.''

Item 8th. Appoints W. H. Morrow executor, waiving the necessity of his giving bond.

By a codicil, the testator directed his minor children to be liberally educated, the money thus used not to be charged against the share of the child. He also expressed a preference that, if his youngest child, Hattie, should die before arriving at the age of twenty-one years, his estate should be divided as soon as the youngest living child came of age.

The testator's estate, at his death, consisted of his stock in trade, valued at $12,557.41, uncollected debts, many of them worthless, household and kitchen furniture, other personal property of little value, a store-house on Market street in Nashville, and his residence in Edgefield, with adjacent lots. His liabilities at the same time were quite large, being estimated at $19,000. The complainant and John Morrow took possession of the goods in store and assets connected with the business, including the debts due the house, and continued to carry on the business of the store under the name of John Morrow & Sons, the stock and assets belonging exclusively to the estate. The result was, it seems, a loss of these assets. On the 5th of November, 1874, the executor suggested the insolvency of the estate, and on the next day filed this bill to transfer the administration to this court. He states the foregoing facts, and adds that "the estate of John Morrow was insolvent at the time of his death." The bill is filed against the widow, children, and creditors of the testator, a schedule of the latter being appended showing debts existing at the testator's death, and the debts since created, the most of them being of the latter character.

On the 13th of April, 1875, Newton McClure filed his petition in this cause, stating that he became bound as surety for the testator in his life-time on several notes described, and that he had recently paid the same, and asks to be allowed to become a party and receive payment of the amount due him " out of the assets of said estate." On the 18th of August, 1875, he files what is styled " the answer of Newton McClure " to the above bill, " and, also, the cross-bill of Newton McClure " against the complainant

and all the defendants to the said bill. This document is addressed to the Chancellor in the usual form prescribed for bills, and commences: "Your orator would show unto your honor," and proceeds in all respects as a cross-bill, and concludes thus: "The premises considered, your orator prays to be permitted to file this as his cross-bill against the defendants before set out, and prays that they be required to answer the same; and that said cross-bill also stand for an answer to the original bill. And on the hearing your orator prays," etc. The relief sought is that he be allowed a priority of satisfaction out of the assets of the estate over the creditors whose debts have been created since the testator's death. The facts, other than those showing the nature of his claims, are substantially the same hereinbefore recited. The notes on which McClure was bound as surety were signed by the testator with the name of John Morrow & Son, and the cross-bill charges that the firm was composed of John Morrow alone. It further mentions the fact that McClure had previously filed his petition to be made a party to the cause, but was not at that time, nor until recently, informed of the fact that the testator had no partner.

To this cross-bill two demurrers have been filed by separate creditors. The object had in view, and the causes assigned, are substantially the same in both. The causes may be divided into two classes—one addressed to the attitude of the complainant McClure, and the form in which he presents himself; the other to the question really involved in the litigation, and that is whether the creditors whose claims originated in the life-time of the testator have any right to priority of satisfaction out of the assets of the estate over the creditors whose claims have been since created. The last is a novel and difficult question, but the causes of the first class are entitled to priority of satisfaction.

The first objection is that McClure has filed his cross-bill before answering the original bill, which, it is urged, he cannot do, under the provisions of the Code, § 4408. But

that section only provides that a defendant who resorts to a cross-bill shall first answer the original bill "before he can require the complainant therein to answer his bill." It does not prevent the filing of the cross-bill, but settles the order in which the original and cross-bill shall be answered. Moreover, the benefit of the provision can only be claimed by the original complainant, the executor; and he is no party to this demurrer, nor would it be a good ground of demurrer even by him. The benefit of the section may be had by an order staying all proceedings under the cross-bill until the original bill is answered—not by demurrer.

It is next objected that the cross-bill is filed as an answer, which cannot be done—the statute, Code, § 4323, only allowing an answer to be filed as a cross-bill, not a cross-bill as an answer. This objection, it will be seen, goes upon the idea that the pleading in question is a cross-bill. But the very next objection is that the pleading is demurrable because it undertakes to make other parties defendant; whereas the same section of the Code allows the answer to be filed as a cross-bill only against the complainant in the original bill. This objection is, obviously, based upon the idea that the pleading in question is an answer. The complainant in the so-called cross-bill is between the two horns of a dilemma, and is certain to be impaled whichever one he comes in contact with. He deserves no mercy, for he had no business to appear in such a "questionable shape."

When the pleading is critically examined, however, its true character is unmistakable. It is a bill, and nothing but a bill, and its nature cannot be changed by calling it an answer, or by praying at the close that it may be taken as an answer. The original complainant is not bound to listen to this prayer, if he chooses to harden his heart against it; and this court, except by consent, has no power to grant it. A defendant must answer the bill to which he is made a party, or suffer the penalty of the law.

Another objection is that McClure has heretofore filed his petition in the cause, setting up his claim, and seeking

to have it paid *pro rata* with others. But this last fact does not appear on the face of the bill, and the demurrer is, to that extent, a speaking demurrer. The bill only shows that he came into the original cause by petition, and the petition itself, if we could look to it, shows that he only asked to be allowed to become a party, " and receive payment of the amount due him out of the assets of the estate," and for general relief. There was nothing to prevent him, upon such an appearance, from insisting, upon the hearing of the cause, that the debts created in the life-time of the testator were entitled to be first paid. The cross-bill to that extent was unnecessary, but it may be advisable for the purpose of developing the facts more fully upon which the claim to priority rests, and permitting a clearer and more direct issue between the creditors themselves.

Another objection is that McClure does not show in his cross-bill that he was a creditor at the testator's death. It is true that the character of debtor and creditor, strictly so-called, did not arise, according to the decisions of our supreme court, until the payment by McClure of the debts for which he was surety for the testator. *Scott* v. *Lanham,* 8 Yerg. 420; *Maxey* v. *Carter,* 10 Yerg. 521; *Marshall* v. *Hudson,* 9 Yerg. 62; *Caplinger* v. *Vaden,* 5 Humph. 629. But these decisions turn simply upon the wording of our statutes, and do not in the least affect the actual relation between the parties created by obligations. *Atkins* v. *Scarborough,* 9 Humph. 517. The obligation created by the act of becoming surety subsists from the moment it is entered into, and the fact that the statute of limitations only begins to run between the parties from the payment of the security debt no more changes its character, or the date of its commencement, than the fact that the statute does not begin to run against a creditor who takes a note of the testator upon long time until the note falls due. *Bradford* v. *McLemore,* 3 Yerg. 318. All of our decisions recognize the relation of principal and surety as creating a liability of the principal to the surety, which authorizes the

latter to come against the estate of the former after his death, no matter how long after the death the surety may be compelled to pay the debt. And obviously it is a play upon words to say that such a liability is not a debt or obligation created in the life-time of the principal, since it originates in the execution of an instrument by the principal and surety, and flows from a principle of equity so universally acknowledged that, in the language of Lord Eldon, those who act under it " may properly be said to act under the head of contract." *Craythorne* v. *Swinburne*, 14 Ves. 169. See, also, *Boyd* v. *Brooks*, 34 Beav. 7 ; Shep. Touch. 482 ; Com. Dig., Administration, B, 14. It is created by the act of becoming surety, and is consummated when the surety pays the debt. *Wayland* v. *Tucker*, 4 Gratt. 268.

If it be that the object of the cross-bill could have been attained, so far as it seeks priority of satisfaction for McClure's debt, without a cross-bill, and that the only benefit to be derived is a clearer presentation of the question, the demurrer to the merits does not cover the whole equity, and, being too broad, must be overruled. But the question sought to be raised is one which must be decided sooner or later, and I have no objection to consider and dispose of it now.

That question is whether the debts created by the testator in his life-time are entitled to be first satisfied out of the assets of his estate, before the debts created by William and John Morrow in the conduct of the business carried on by them, under the will, since the testator's death.

To solve this question properly we must first understand accurately the provisions of the will touching the payment of debts and the disposition of the testator's property. By the first item of the will the testator declares unmistakably his intention to be that his debts shall be paid " as soon as possible " after his death, " out of any moneys I may die possessed of, or may first come to the hands of my executor." His next wish is that his home place be sold, and the proceeds vested in a home for his wife for life, and

his children during minority. Then he provides for equality among his children in the final division of his property, but without deduction from their shares of sums advanced for the support and education of certain of his children. He gives his executor possession of the proceeds of his home place, and of his stock in trade and property, "to be managed and applied" as directed in the will. These directions are that his sons, William H. and John, shall go into business —the books of his own business to be closed from the date of the probate of his will—and carry it on, the surplus profits, after paying their salaries and expenses, to be used for the support of his wife and minor children, as provided by the third item of his will. The executor is clothed with power to make advancements to the children as they come of age, to be accounted for in the final division. The final division is to be made by a conversion of all his property into money when his youngest child shall come of age, or, if she died, at the arrival of age of the next youngest, unless it should become impracticable or improper to carry on the partnership business, and, in that event, the business was to be closed and the estate divided. If his sons do go into business as suggested, then his desire is "that all the property I die possessed of shall stand responsible for the debts incurred in carrying on the partnership business provided for in this bill."

The personal estate of a decedent is the primary fund for the payment of debts, and will always be first applied until exhausted, unless there is an express provision in the will that the debts shall be paid in whole or in part out of some particular fund specially designated for that purpose; and it requires express words, or manifest intent, to disturb this order. So settled since the case of *The Duke of Ancaster* v. *Mayer*, 1 Bro. C. C. 454, where Lord Thurlow produced order out of chaos in his more than usual incisive style. See, also, *Brummel* v. *Prothero*, 3 Ves. 113; *Hancox* v. *Abbey*, 11 Ves. 188; *Bootle* v. *Blundell*, 1 Mer. 122; *Gittins* v. *Steele*, 1 Swans. 28; *Boughton* v. *Boughton*, 1 H.

L. Cas. 406; *Livingston* v. *Newkirk*, 3 Johns. Ch. 312; *Rogers* v. *Rogers*, 1 Paige, 188; *Stewart* v. *Carson*, 1 Des. 500. In this state, although real as well as personal property has always been assets for the payment of debts, under 5 Geo. 2, 7, 4 (Code, § 2252), yet satisfaction was first to be had out of personalty. *Peck* v. *Wheaton*, M. & Y. 353, and cases cited.

Although the testator may, by express words or manifest intent, direct out of what portion of his estate his debts shall be paid, he cannot impair the rights of creditors. They may pursue all the remedies which belong to them. A court of chancery will, however, marshal the assets so as to carry out the testator's wishes, as between the devisees and legatees, but not to the detriment, or even embarrassment, of creditors. 2 Jar. on Wills, 545; 3 Redf. on Wills, 354. Debts must be first paid. All legacies, special and general, must yield to any valid legal claim against the testator at the time of his death. *Foly's Case*, Freem. Ch. 49; *Kidney* v. *Coussmaker*, 12 Ves. 154; *Lomas* v. *Wright*, 2 Myl. & K. 769; *Spode* v. *Smith*, 3 Russ. 511. Even voluntary bonds or covenants must be first paid in preference to legacies. For a bond or covenant, however voluntary, transfers a right in the life-time of the obligor; whereas legacies arise from the will, which takes effect only from the testator's death, and, therefore, they ought to be postponed to a right created in his life-time. Toller, 283; Will. on Executors, 812; *Jones* v. *Powell*, 1 Eq. Ca. Abr. 84, pl. 2; *Cray* v. *Rooke*, Cas. *temp.* Talbot, 156; *Lechmere* v. *Carlisle*, 3 P. W. 222; *Watson* v. *Parker*, 6 Beav. 283.

In the will before us the testator has not, by express words or manifest intent, charged any portion of his realty with the payment of his debts to the exoneration of the personalty. The order in which his property is liable to be subjected is not altered by the will. If the will, by its first item, charges his estate, or any part of it, with the payment of debts, it only does what the law would have done without it, leaving the personalty still primarily liable. *Tench*

v. *Cheese*, 6 De G. M. & G. 453 ; *Allan* v. *Gott*, L. R. 7 Ch.
App. 444. But the legal effect of this provision of the will,
as between the creditors and devisees, is not raised by the
demurrers. It could be material only in the event it became
necessary to marshal the assets, as between them, so as to
throw the burden upon one part of the estate rather than
another. If the whole estate will be exhausted in the pay-
ment of debts, the construction is of no importance. So,
its construction would be immaterial as between the two
classes of creditors, if the law give the creditors of the
testator in his life a right to priority of satisfaction over
debts created after his death. Let us see, then, what is the
law in this regard.

A trade is not transmissible, but put an end to by the
death of the trader. The office of an executor does not
authorize him to continue the trade of the testator. On
the contrary, he commits a breach of trust by continuing
the testator's property in it. *Ex parte Watson*, 2 V. & B.
415 ; *Barker* v. *Barker*, 1 T. R. 295. If an executor or
administrator do continue the trade of the deceased, except
under order of a court of chancery, he can individually
derive no profit from its success, and, if unsuccessful, he
will be personally responsible, on failure of assets, for the
debts contracted in the business after the testator's death,
to the extent of his own property and person. *Ex parte
Garland*, 10 Ves. 119 ; *Ex parte Richardson*, 1 Buck. 209 ;
*Ex parte Nutt*, 1 Atk. 102 ; *Heathcote* v. *Hulme*, 1 Jac. &
W. 122 ; *Thompson* v. *Brown*, 4 John. Ch. 619.

Even if the testator authorize his trade to be continued,
the executor who carries it on makes, not only the testator's
estate so employed under the will, but himself personally,
and his own property, liable to debts incurred after he goes
into it, and renders himself personally liable to the bankrupt
laws. *Ex parte Garland*, 10 Ves. 119 ; *Ex parte Richard-
son*, 3 Madd. 157 ; *Viner* v. *Cadell*, 1 Esp. 88. An executor
can have no justification for continuing the business of a
partnership except by the positive direction of the will, and

then only where the estate is clearly solvent. *Kirkman* v. *Booth*, 11 Beav. 280. A testator who directs the continuance of a partnership of which he was a member may either bind all, or a specific part, of his assets, or only so much as are embarked in the business, and the claim of new creditors will be strictly limited to the assets thus charged. *Thompson* v. *Andrews*, 1 Myl. & K. 116 ; *Burwell* v. *Mandeville's Executors*, 2 How. 560 ; *Pitkin* v. *Pitkin*, 7 Conn. 307 ; *Davis* v. *Christian*, 15 Gratt. 37.

The taking up of an executorship is an engagement to answer all debts of the deceased, and all undertakings that create a debt, as far as there are assets, but doth not embark the executor in the personal trusts of the deceased. *Marshall* v. *Broadhurst*, 1 Tyrw. 349 ; *Cooke* v. *Colcraft*, 2 W. Bl. 856 ; 3 Bac. Abr., Executors, P, 1. It is, accordingly, doubtful how far the testator can, by express contract, bind his executors to continue a business, so as to enable the other contracting party to enforce its specific execution. *Downs* v. *Collins*, 6 Hare, 418. And it is clear that without a contract made by him, and " the most distinct and positive authority and direction given by the will itself for that purpose," the executor is not bound nor authorized to enter into a new partnership, to commence after the testator's death. *Kirkman* v. *Booth*, 11 Beav. 280. And creditors might, of course, intervene to prevent such an act until their debts were paid. *Ex parte Garland*, 10 Ves. 119. The creditors of the testator, moreover, have the right to subject the whole of his property in discharge of their demands. Id. 120. What effect their acquiescence in the action of the executor may have on these rights is a point sought to be raised, but not in fact raised, upon the allegations of the bill, by the demurrer.

The will before us does not undertake to continue a partnership business under, and in compliance with, a contract entered into by the testator with a third person. It does not even undertake to continue the testator's own business, as if his death had not intervened. On the contrary, he

directs the books of his business to be closed from the date of the probate of his will, the balances thus found against his two sons, William H. and John, to be carried into the new books against them. Then, upon this basis, and as a new firm, he desires his sons to go into partnership, taking charge of his stock in trade and business, and continue to carry the business on until it should " become impracticable or improper." It cannot be pretended for a moment that creditors whose debts were created in the testator's lifetime, or the testator's wife and minor children, under the will, were to be postponed in their rights until the expiration of this partnership, which might continue until the youngest child came of age ; or that they should be compelled to contribute, out of moneys received in discharge of their claims, to losses incurred in carrying on the new partnership. The impossibility of entertaining such a construction of a will was specially dwelt on by Lord Eldon, in *Ex parte Garland*, 10 Ves. 121, and by Turner, L. J., in *McNeillie* v. *Acton*, 4 De G. M. & G. 753.

The obvious intention of the testator is that his debts shall be paid as soon as possible, and the home place sold in a reasonable time, and the proceeds invested for the benefit of his wife and children. The partnership was to be conducted for the like benefit of his wife and children. It was not intended to interfere with the rights of creditors. On the contrary, the testator expressly directs that they shall be paid as soon as possible after his death, out of moneys on hand, or which might first come to the hands of his executor.

The first question which presents itself on this state of facts is whether the testator does not expressly charge his entire estate with the payment of his debts in the first instance. If he does, the litigation, except upon the question of laches or acquiescence, is at an end. It is first argued that the direction of the will, that money shall be used in the payment of debts, is not a direction that other property than money shall be used for that purpose, citing

36

*Alexander* v. *Miller*, 7 Heisk. 65, 76. In that case the court had under consideration the marshalling of assets between the devisees and legatees, in which view it became essential to ascertain whether the testator had pledged any, and what, property for the the payment of debts in exoneration of the personalty; and, in the absence of such pledge, in what order the assets should be subjected, as between the legatees, so as to carry out the testator's wishes. The question is immaterial as between creditors and legatees, because, as we have seen, the creditors are not precluded by the wishes of the testator from enforcing their legal rights, which is to subject all the assets—first the personalty, then the realty—and equity will never interfere to their detriment, or even embarrassment. The direction of the will undoubtedly is that the debts be promptly paid. The law says the same. There is now no question before the court between the creditors and the legatees. As between creditors existing at the testator's death, and subsequent creditors created under the will, the intention to charge the entire estate would seem to be clear. And although, as between creditors and legatees, a direction to pay debts out of moneys on hand, or to be received, might limit the provision to money, yet such a direction, coupled with a devise of lands to the executor, and a power of sale, would probably extend the provision to realty. *Clowdsley* v. *Pelham*, 1 Vern. 411; *s. c.*, 1 Eq. Ca. Abr. 198, pl. 2; *Henvell* v. *Whitaker*, 3 Russ. 343.

Independent of the will altogether, the real as well as the personal estate would be chargeable with the payment of debts. So far, therefore, as the creditors in existence at the testator's death are concerned, they are entitled to satisfaction out of both realty and personalty, will or no will. This is not denied to be the law, but it is insisted that, except as to moneys on hand or to be received from personalty (about which there is now no controversy, there being no such money to fight over), the new creditors are, by the pledge of the testator's estate for the payment of such

debts, placed on an equality with the old creditors. This would depend upon the testator's intention, the point we have just discussed, and, granting the intention to have been to create such equality, upon the further point whether he had any power to create such equality.

The law gives to a testator very large powers of disposition, but it is of the surplus of property after the payment of all his debts. His debts include every obligation entered into by him during his life which creates a valid charge on his estate. He may, therefore, make a valid contract with a third person for the continuance of a partnership business after his death, which will either bind his estate to its specific performance, or to damages for a violation. And the liability thus incurred may be entitled to equality of satisfaction with other indebtedness out of his estate. But I know of no rule, principle, or law by which the testator can create a valid contract *personally* binding on him after his death. No authority has been produced tending in the least to establish such a position. A will (*voluntas*), *ex vi termini*, means a voluntary disposition of property to take effect after death. "A last will," says Swinburne, translating from the Latin, "is a lawful disposing of that which any would have done after death. By which words a testament differeth from all other sentences proceeding from our will, and from whatever actions which take their effect in the lifetime of the testator. For a testament respecteth that which is to be performed after the death of the testator; and, therefore, so long as he liveth, the testament is of no force, but doth take his strength and is confirmed by the testator's death." Swin. pt. 1, §§ 3, 4. By such an instrument the testator may bind his estate, but he cannot bind himself personally. But he cannot bind his estate to the prejudice of his creditors; for that, as we have seen, would not be a "lawful disposing" of property after death.

It follows that the new creditors are not creditors of the testator at all, and so are the authorities already cited. See, also, to the same effect, *Farhall* v. *Farhall*, L. R. 7

Ch. App. 123; *Cutbush* v. *Cutbush*, 1 Beav. 184. They are creditors of the two sons who went into partnership in accordance with their father's wish. These sons are the debtors, in person and property, even unto bankruptcy. These sons, it is true, are entitled by the will to look to the whole of the testator's estate for indemnity from liabilities fairly and honestly incurred in carrying out the testator's will. And the creditors whose debts were created by them would, upon well-established principles, be subrogated to the rights of the sons to the extent of their debts. *Ex parte Garland*, 10 Ves. 120; *Ex parte Richardson*, 3 Madd. 138. But the testator's sons could not reach, for their indemnity, any of the assets of the estate needed for the payment of the testator's own debts, neither can their creditors. *Lucas* v. *Williams*, 4 De G. F. & J. 439.

The provision of the will for the carrying on of the business by the testator's sons is, in legal effect, a legacy to them of all his property in trust to carry on the business for the benefit of the testator's wife and children. The sons and the wife and children are, in this view, legatees under the will. And we have seen that all legacies, special or general, must give way to the rights of creditors of the testator. All that the new creditors, who are creditors of the sons, can reach, would be the interest of their debtors in the estate. But that interest is subordinate to rights of the testator's own creditors.

The direction of the will touching the partnership business, and the pledge of the testator's estate for the indemnity of the sons, operate, in one respect, beneficially for the creditors existing at the testator's death. The rights of these latter would be primarily on the personal assets, and, if those assets were lost by a *devastavit* of the executor, the remedy against the land would be gone. *Gilman* v. *Tisdale*, 1 Yerg. 285. But a loss of personalty in carrying out an express direction of the will cannot be considered a *devastavit*. The sons would be entitled, in order to reim-

burse themselves for any loss thus fairly and honestly incurred, to resort to the residue of the estate pledged for their indemnity. And the original creditors, who had been thereby deprived of their primary fund, would, upon the well-recognized principle already mentioned, be subrogated to their rights against such residue.

I am of opinion, therefore, that the complainant in the cross-bill is entitled to priority of satisfaction out of the real assets before the creditors whose claims have originated since the testator's death. I am also of opinion that there is nothing in the face of the cross-bill, the facts of which are admitted by the demurrer, to prejudice this claim by reason of acquiescence or laches. The demurrers must be overruled.